Thomas BATES, et al., Plaintiffs,

v.

Bill JONES, et al., Defendants.

No. C 95–2638 CW.

United States District Court,
N.D. California.

Oct. 19, 1995.

Joseph Remcho, Remcho Johansen & Purcell, San Francisco, CA, for Tom Bates, Edward H. Lyman, Richard D. Lewis, Lawrence J. Buchalter, Jonathan Browning and Rachel Sherman.

Deborah J. La Fetra, Victor J. Wolski, Sacramento, CA, for Peter F. Schabarum, Lewis K. Uhler, Lee A. Phelps, National Tax Limitation Committee and Alliance of California Taxpayers & Involved Voters.

Karen Leaf, CA State Atty. General, Sacramento, CA, for Bill Jones.

Kelvin H. Booty, Jr., County of Alameda Counsel's Office, Oakland, CA, for Bradley J. Clark.

## ORDER GRANTING MOTION TO INTERVENE; DENYING MOTIONS FOR ABSTENTION, TO DISMISS, AND FOR PRELIMINARY INJUNCTION; AND DENYING APPLICATION FOR CERTIFICATION FOR APPEAL AND FOR STAY

WILKEN, District Judge.

Plaintiffs' motion for preliminary injunction, Applicants for Intervention's motions to intervene, for abstention and to dismiss, and Defendant Bill Jones' motion to dismiss were

heard by this Court on September 12, 1995. On September 25, 1995, Defendants and Intervenors jointly applied for an order certifying for immediate appeal any order denying their motions to dismiss and staying the proceedings in this matter pending resolution of that appeal; Plaintiffs filed written opposition to that application. Having considered the papers filed by all parties and oral argument on the motions, and good cause appearing, the Court hereby GRANTS the motion to intervene in part, DENIES the motions to dismiss and for abstention, DENIES the motion for preliminary injunction, and DENIES the application for certification and stay, for the reasons stated below.

*STATEMENT OF FACTS*

This action challenges California's term limits for state legislators. On November 6, 1990, California voters passed Proposition 140, which, *inter alia,* amended Section 2(a) of article IV of the California Constitution to provide that no state senator may serve more than two terms and no member of the state Assembly may serve more than three terms. The statement of purpose enacted by the voters is as follows:

The people find and declare that the Founding Fathers established a system of representative government based upon free, fair and competitive elections. The increased concentration of political power in the hands of incumbent representatives has made our electoral system less free, less competitive, and less representative. The ability of legislators to serve unlimited number of terms, to establish their own retirement system, and to pay for staff and support services at state expense contribute heavily to the extremely high number of incumbents who are reelected. These unfair incumbent advantages discourage qualified candidates from seeking public office and create a class of career politicians, instead of the citizen representatives envisioned by the Founding Fathers. These career politicians become representatives of the bureaucracy, rather than of the people whom they are elected to represent.

To restore a free and democratic system of fair elections, and to encourage qualified candidates to seek public office, the people find and declare that the powers of incumbency must be limited. Retirement benefits must be restricted, state-financed incumbent staff and support services limited, and limitations placed upon the number of terms which may be served.

Cal. Const. art IV, § 1.5. Applicants for Intervention Peter Schabarum and Lewis K. Uhler were official proponents of Proposition 140. Applicants for Intervention National Tax Limitation Committee (NTLC), Lee A. Phelps and the Alliance of California Taxpayers and Involved Voters (ACTIV) were also supporters of Proposition 140.

In 1991, the facial validity of Proposition 140 under California and federal constitutional law was challenged by a Petition for Writ of Mandate in the California Supreme Court. Petitioners included the Assembly of the State of California, eight individual members of the Assembly, and four voters supportive of incumbent members of the Assembly. Neither Tom Bates nor any of his constituents were parties to that action or participated in any way in the litigation. Petitioners there were represented by law firm of Remcho, Johansen & Purcell, the law firm representing Plaintiffs in the current action.

The California Supreme Court upheld the facial validity of the term limit provisions over a First and Fourteenth Amendment challenge. *Legislature v. Eu,* 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991). Petitioners unsuccessfully sought review by the United States Supreme Court. 503 U.S. 919, 112 S.Ct. 1292, 1293, 117 L.Ed.2d 516 (1992).

In a separate state court action brought by Schabarum against the California Legislature, the Legislature's cross-complaint challenged the validity of Proposition 140 as a revision, rather than amendment, of the Constitution which could not be accomplished by initiative. That action and cross-complaint were dismissed, and an appeal is pending in the California Court of Appeal for the Third Appellate District. *Schabarum v. California Legislature,* Docket No. 3 Civ. C020336.

Plaintiff Tom Bates has represented the 14th Assembly District since 1977. That district voted against Proposition 140 by a mar-

gin of 63% to 37%. That district has also reelected Plaintiff Bates by wide margins since the 1990 elections in which term limits were enacted: in 1992, Plaintiff Bates received 82% of the vote, and in 1994, 78.5%. Under California's term limits, Plaintiff Bates will be required to step down in December, 1996 and may never again in his life run for or serve in the California Assembly.

Plaintiff Bates seeks to run for reelection to his eleventh consecutive term of office in 1996. Plaintiffs Edward H. Lyman, Richard Sterling, Ardis Graham, Richard D. Lewis, Lawrence J. Buchalter, Jonathan Browning, and Rachel Sherman, constituents of the 14th Assembly District, seek to vote for Plaintiff Bates in that election. The voter Plaintiffs believe that Plaintiff Bates is an exceptional representative, who serves all his constituents well, and who is unusually concerned with and effective at representing the needs of low income and disabled citizens and protecting the environment. They do not believe that other candidates would represent them as effectively and well as Bates. In addition, some of the voter Plaintiffs expressly oppose term limits, not only because it interferes with their right to choose a candidate, but also because it deprives the legislature of needed expertise.

In order to participate in the election, Plaintiff Bates must file a declaration of intention by November 29, 1995. He declares that he must also begin campaigning immediately in order to compete in the primary election to be held on March 26, 1996.

## DISCUSSION

### Motion for Intervention

Rule 24(a) of the Federal Rules of Civil Procedure provides for intervention as of right if the application for intervention is timely, the applicant has an interest relating to the subject matter of the action, without intervention the protection of that interest may be impaired or impeded by the disposition of the action, and the interest is not adequately represented by an existing party. *California ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 792 F.2d 779, 781 (9th Cir.1986).

Here there can be no question that the application is timely. However, Plaintiffs claim that Applicants for Intervention have no interest in the subject matter of this litigation.

All Applicants for Intervention claim an interest in the subject matter of this litigation as sponsors of Proposition 140 and proponents of term limits. Applicant for Intervention Schabarum further claims an interest in the subject matter of this litigation in that this litigation may affect the course of the *Schabarum v. California Legislature* action.

The individualized interest of official proponents of ballot initiatives in defending the validity of the enactment they sponsored is sufficient to support intervention as of right. *Yniguez v. State of Arizona*, 939 F.2d 727 (9th Cir.1991). "There is a virtual *per se* rule that the sponsors of a ballot initiative have a sufficient interest in the subject matter of litigation concerning that initiative to intervene." *Id.* at 733. The interest of Schabarum based on his related litigation is also sufficiently individualized. These individualized interests are distinguishable from the general interest of supporters of term limits, however. A generalized public policy interest shared by a substantial portion of the population does not confer a right to intervene. *Tahoe Regional Planning Agency*, 792 F.2d at 781–82. *Cf. Idaho v. Freeman*, 625 F.2d 886, 887 (9th Cir.1980).

The interest of Schabarum and Uhler, as the official proponents of Proposition 140, in its continued validity could obviously be impaired in this litigation. Therefore, they are entitled to intervene as of right if their interest is not adequately represented by existing parties.

The Ninth Circuit has set forth three factors to be considered in evaluating the adequacy of representation of the intervenor's interest by an existing party: (1) whether the interests of the existing party and the intervenor are sufficiently similar that the existing party would undoubtedly make the same legal arguments as the intervenor; (2) whether the existing party is capable and willing to make such arguments; and

(3) whether the intervenor would add some necessary element not covered by the existing parties to the proceedings. *Blake v. Pallan,* 554 F.2d 947, 954–55 (9th Cir.1977).

█ The burden is on the applicant to demonstrate the inadequacy of the present representation, but the burden is a light one. "The requirement of [Rule 24] is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972).

Plaintiffs argue that intervention is unnecessary because the interest of intervenors will be adequately represented by Defendant Bill Jones, who, as the Secretary of State of California, will vigorously defend the validity of the California constitutional provision. The Court disagrees for two reasons.

First, an official sponsor of a ballot initiative may be considered to add an element not covered by the government in defending the validity of the initiative in that the very act of resorting to a ballot initiative indicates a rift between the initiative's proponents and voters and their elected officials on the issue that underlies the initiative. *Yniguez v. Arizona,* 939 F.2d at 733. This is particularly so in the instant case, where the subject matter of the initiative was outwardly hostile to elected officials.

In addition, the differences between the arguments of the Applicants for Intervention and Defendant Jones is demonstrated in the motions now before the Court. Applicants for Intervention move for abstention by this Court pending resolution of a state court action brought by Applicant for Intervention Schabarum against the California Legislature; Defendant Jones opposes the motion on the grounds that abstention in this matter would impair state functions. Further, although both Applicants for Intervention and Defendant Jones move for dismissal on grounds of res judicata, Applicants for Intervention move to dismiss on additional grounds not raised by Jones, including a statute of limitations argument and a standing argument.

█ Accordingly, the motion for intervention is granted as to Applicants for Intervention Schabarum and Uhler. However, the motion is denied as to Applicants for Intervention Phelps, NTLC, and ACTIV on the grounds that the interest of Phelps, NTLC and ACTIV in the subject matter of the litigation is not sufficiently individualized to warrant intervention as of right. Further, their interest is so clearly represented by Intervenors Schabarum and Uhler that permissive intervention is wholly unnecessary.

*Motion for Abstention*

Having permitted Schabarum and Uhler ("Intervenors") to intervene in this action, the Court must consider their motion for abstention. It is not well taken.

█ Intervenors argue that this Court should abstain in the instant action due to the pendency of the *Schabarum v. California Legislature* litigation under the doctrine of *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under that doctrine, a federal court may abstain from exercising its jurisdiction over an issue of federal constitutional law until the highest state court has had a chance to resolve any state law issues which might obviate the need for the constitutional determination. *"Pullman* abstention" is an exception to the general rule that federal courts have a "virtually unflagging obligation" to exercise their jurisdiction. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976).

The issue raised by the cross-complaint in *Schabarum* of whether the changes enacted by Proposition 140 constituted a revision rather than amendment of the California Constitution has been decided by the California Supreme Court in *Legislature v. Eu.* There is accordingly no basis for the exercise of *Pullman* abstention in the instant case, despite the possible pendency of the issue in *Schabarum,* because there is no reasonable chance that a California court, in defiance of the California Supreme Court, will invalidate

Proposition 140 on state constitutional grounds.

Further, the policy of *Pullman* abstention to avoid unnecessary impairment of state functions and needless friction with state policies is wholly lacking where, as here, the state itself opposes abstention. To the contrary, Defendant Jones contends on behalf of the State of California that abstention in this matter would itself impair state functions and throw the 1996 elections into a state of chaos. Accordingly, Intervenors have not demonstrated cause for abstention, and their motion for abstention is denied.

*Motion to Dismiss*

Defendant Jones moves to dismiss the complaint for failure to state a claim on the grounds that this action is barred by res judicata and on the further grounds that California's term limits are constitutional as a matter of law. Intervenors also move to dismiss on the grounds of res judicata and on the further grounds that Plaintiffs lack standing and the action is barred by the statute of limitations. Each ground is considered below.

*1. Standing*

■ Standing to sue requires an injury in fact suffered by the Plaintiff, a causal connection between the injury and the conduct complained of, and the likelihood that the injury would be redressed by a favorable outcome. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). An injury in fact is an actual or imminent invasion of a legally protected interest which is concrete and particularized. *Id.* at 560, 112 S.Ct. at 2136.

■ Intervenors argue that voter Plaintiffs have suffered no injury which would confer standing on them to bring this action, because they have no legally protected interest in voting for a person ineligible to run for office. Their argument is not well taken,

because it simply begs the hard question presented by this case of whether the term limit which makes Plaintiff Bates ineligible to run for office is an unconstitutional impingement on the voters' right to associate.

*2. Res Judicata*

■ A federal court must give a state court judgment the same preclusive effect under the doctrines of res judicata and collateral estoppel as it would receive under the law of the state in which the judgment was rendered. *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). Therefore, this Court must look to California law to determine whether *Legislature v. Eu* has a res judicata effect on this action.[1]

■ Under California law, a prior judgment has res judicata effect if the issue in the prior proceeding is identical to the one in the present action, there was a final judgment on the merits, and the party against whom the preclusive effect is asserted was a party or in privity with a party to the prior proceeding. *Bernhard v. Bank of America Nat. Trust & Savings Ass'n,* 19 Cal.2d 807, 813, 122 P.2d 892 (1942).

The issue in the present action is clearly identical to that litigated to final judgment in *Legislature v. Eu.* However, none of the Plaintiffs here were parties to that proceeding. Thus, whether this action is barred by res judicata depends upon whether the Plaintiffs here were in privity with the Petitioners in *Legislature v. Eu.*

■ The privity doctrine precludes non-parties from relitigating a case when there is "such an identification in interest of one person with another as to represent the same legal rights." *Clemmer v. Hartford Ins. Co.,* 22 Cal.3d 865, 875, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978). Privity is an extremely flexible concept. "Privity is essentially a shorthand statement that collateral

1. Whether a prior judgment has a res judicata effect is an entirely different issue from the precedential value of the prior judgment under the doctrine of *stare decisis.* Thus Intervenors are incorrect in arguing that this Court is bound under *Migra* to treat *Eu* as binding precedent on federal issues. A decision of a state supreme court construing the Constitution of the United States, while entitled to respect, is not binding upon the federal courts. *Watson v. Estelle,* 886 F.2d 1093, 1095 (9th Cir.1989), citing *Smayda v. United States,* 352 F.2d 251, 253 (9th Cir.1965), *cert. denied,* 382 U.S. 981, 86 S.Ct. 555, 15 L.Ed.2d 471 (1966).

estoppel is to be applied in a given case; there is no universally applicable definition of privity." *Lynch v. Glass,* 44 Cal.App.3d 943, 947, 119 Cal.Rptr. 139 (1975). However, privity does have boundaries. Issue or claim preclusion may be applied only if the requirements of due process are met. *Clemmer,* 22 Cal.3d at 875, 151 Cal.Rptr. 285, 587 P.2d 1098; *Lynch,* 44 Cal.App.3d at 948, 119 Cal. Rptr. 139. Due process requires that the nonparty have had an identity of interest with and adequate representation by the losing party in the first action, and that the circumstances have been such that the nonparty should reasonably have expected to be bound by the prior adjudication. *Id.*

Nonparties have been found in privity in two types of circumstances. First, a nonparty should reasonably expect to be bound if he or she in reality contested the prior action although without making a formal appearance. *Lynch,* 44 Cal.App.3d at 949, 119 Cal.Rptr. 139. Thus, a nonparty who had a proprietary or financial interest in and control of a prior action may be precluded from relitigating the action. *Id.*

Second, a nonparty should reasonably expect to be bound if the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for a nonparty. *Id.* Thus, preclusion has been applied against a corporation which was a mere alter ego of an individual party in the first action, *Teitelbaum Furs, Inc. v. Dominion Ins. Co. Ltd.,* 58 Cal.2d 601, 25 Cal.Rptr. 559, 375 P.2d 439 (1962), *cert. denied* 372 U.S. 966, 83 S.Ct. 1091, 10 L.Ed.2d 130 (1963), against an agent whose principal (the real party in interest) was a party to the first action, *French v. Rishell,* 40 Cal.2d 477, 254 P.2d 26 (1953), against a wife whose husband asserted community rights in the first action, *Zaragosa v. Craven,* 33 Cal.2d 315, 202 P.2d 73 (1949), against a grantee whose rights could not exceed those of the grantor who was a party in the first action, *State of California v. Drinkhouse,* 4 Cal.App.3d 931, 84 Cal.Rptr. 773 (1970), against a class of retired pension plan members and surviving spouses where the class of retired plan members was a party in the first action, *Frazier v. City of Richmond,* 184 Cal.App.3d 1491, 228 Cal.Rptr. 376 (1986), and against residents whose common interests had been represented by municipal governments, *Rynsburger v. Dairymen's Fertilizer Co-op Inc.,* 266 Cal.App.2d 269, 72 Cal.Rptr. 102 (1968).

Privity does not arise, however, simply because two separate parties share a common or even identical interest. Thus, in *Lynch v. Glass,* the trial court erred in finding that plaintiff landowners were collaterally estopped from litigating the issue of whether there was a public easement over a private roadway by a prior judgment against two corporations on the same issue. Although the plaintiffs and the prior parties had an identical interest in a determination that a public easement did exist, the plaintiffs "did not stand in a relationship with the two corporations which would put them on reasonable notice that they avoided the prior proceedings at their peril." 44 Cal.App.3d at 949, 119 Cal.Rptr. 139. Further, although the plaintiffs were fully aware of the prior litigation, one of the plaintiffs even appearing as a witness on behalf of the corporations in that case, they had no power to control any aspect of the case. *Id.*

In the instant case, it is undisputed that none of the Plaintiffs controlled the prior action of *Legislature v. Eu.* The primary issue is whether any of the Petitioners in the prior action can fairly be said to have stood in a representative capacity to the current Plaintiffs so as to have put these Plaintiffs on notice that they would be bound by the result there. Here, none of the Plaintiffs was intimately tied to the Petitioners such that their interests merged indivisibly, as with a husband and wife with respect to community assets or an agent and principal. The closest analogy to the instant case is that of *Rynsburger,* in which a judgment against municipalities precluded residents of those municipalities from relitigating the issues.

In *Rynsburger,* residents sued a cooperative for an injunction to abate the alleged nuisance of a plant which stockpiled manure resulting from the operation of numerous dairies and composted, packaged and sold it as commercial fertilizer. A temporary restraining order was issued, but was later

dissolved upon a finding that the operation of the cooperative was necessary for health reasons. Plaintiffs' counsel then appeared before the city councils of the municipalities in which the plaintiffs resided and requested that an action be initiated by the municipalities to abate the cooperative's operations. Three municipalities filed nuisance actions which were consolidated and jointly tried. The court found that the cooperative's operations did not constitute a public nuisance, but imposed certain conditions upon its operations to minimize its environmental effects. Thereafter, the private plaintiffs took steps to reactivate their private nuisance suit. The renewed suit was held barred by res judicata.

The court relied on the facts that the plaintiffs had requested that the municipalities commence public nuisance actions and provided them with their own litigation materials, that there was a strong identity between the allegations and exhibits in the private action and in the public nuisance action, that the municipalities had express statutory authority to bring the suit for the benefit of their residents, that the interests of the residents received "actual and efficient protection" in that the judgment imposed numerous and complex regulations on the operations of the cooperative, and that the first court retained jurisdiction over the public nuisance action.

The instant case is clearly distinguishable. Here, the Plaintiffs did not request that the Legislature bring the prior action, nor were they involved in the action, such as by providing litigation materials and testifying. Further, the Legislature has not been shown to enjoy express statutory authority to sue on behalf of its members or its constituents similar to the express statutory authority of a city legislative authority to direct its city attorney to bring action for the benefit of the entire community to abate a public nuisance located within the city. *See* Cal.C.C.P. § 731. Finally, there is no showing that the particular interests of these Plaintiffs received actual and effective protection in *Legislature v. Eu*. In that case, the petitioners chose for tactical reasons to bring the action directly to the California Supreme Court on a petition for mandate, rather than pursuing the more usual course of litigation beginning with fact-based proceedings in a trial court, and to argue that the term limit provision should be interpreted as a lifetime ban rather than a ban on consecutive terms. That Plaintiffs here had no control over these litigation strategies in *Eu* weighs against privity.

Further, it is evident that some of the voter Plaintiffs did not even have an interest in common with the *Legislature v. Eu* petitioners at the time of that litigation. Plaintiffs Sterling and Sherman were not California residents at the time of that litigation; Plaintiffs Graham and Browning were not yet old enough to vote.

There is also no indication that Plaintiffs Bates, Lyman and Lewis were on notice that their First Amendment rights would be foreclosed by the *Legislature v. Eu* action. That lawsuit was not brought as a class action. No voters from Plaintiff Bates' district were parties. It was apparent that the Legislature was representing its own institutional interests rather than the interests of its members or constituents, in that individual members and constituents joined the action to assert their own interests.

In light of all these factors, it appears that application of res judicata would be inconsistent with the requirements of due process. Defendants and Intervenors have failed to demonstrate the applicability of that doctrine. The Court concludes that this action is not barred by the doctrine of res judicata. Accordingly, the issue of whether the public interest exception to the doctrine of res judicata is applicable need not be reached.

### 3. Statute of Limitations

 The statute of limitations applicable to § 1983 actions is that for tort actions: one year from the date of the injury. Intervenors argue that any injury caused by term limits accrued at the time the term limits were promulgated, such that this action is untimely. They cite no authority, however, for the proposition that constitutional challenges to enactments must be brought within one year of the time they are enacted rather than within a year of the time the enactment actually causes an injury, that is, an actual or

imminent invasion of a legally protected interest which is concrete and particularized.

Policy considerations convince this Court that the rule asserted by Intervenors cannot be correct, for constitutional law is constantly evolving, and a statute which may seem perfectly consistent with constitutional principles at the time it is enacted may be seen to violate constitutional principles in light of subsequently developed doctrines. Accordingly, and because the injury asserted in this action is now imminent but has not even yet become actual, this action is not barred by the statute of limitations.

### 4. Failure to State a Claim

 A motion to dismiss for failure to state a claim must be denied unless it appears that the plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco*, 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). All material allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiffs. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

 This action states a challenge to California's term limits under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Defendant Jones argues that Plaintiffs fail to state a claim, in that California's term limits are constitutional as a matter of law, citing *Legislature v. Eu*, which rejected the same constitutional challenge. A full discussion of that decision is necessary here. However, it is helpful first to review the background of the constitutional law applied in that case.

The seminal case is *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). That case concerned John Anderson's independent candidacy for the November, 1980 elections for the office of President of the United States. At the time Anderson announced his candidacy, on April 24, 1980, the March 20 deadline for filing a nominating petition in the state of Ohio had already passed. Accordingly, the Ohio Secretary of State refused to accept Anderson's nominating petition on May 16, 1980. The Supreme Court held that Ohio's early filing deadline placed an unconstitutional burden on the voting and associational rights of Anderson's supporters. The Court analyzed the issue as follows.

The *Anderson* Court first noted that although the direct impact of the early filing deadline falls on aspirants for office, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." 460 U.S. at 786, 103 S.Ct. at 1568, citing *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). The Court's primary concern was with "the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.'" *Id.*

 Ballot access restrictions burden two different yet related types of rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Id.* at 787, 103 S.Ct. at 1569, citing *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Voters can assert their preferences only through candidates; "it is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Id.*, citing *Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). Excluding candidates from the ballot burdens voters' freedom of association, because "an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens." *Id.* at 787–88, 103 S.Ct. at 1569.

 Although these rights of voters are "fundamental," not all restrictions on candidates' ballot eligibility impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates. *Id.* at 788, 103 S.Ct. at 1569. Elections must be

regulated in order to make them fair, honest and orderly. *Id.* Each regulation, whether it concerns voter registration, candidate eligibility or the voting process itself, "inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Id.* However, the State's important regulatory interests are usually sufficient to justify "reasonable, nondiscriminatory restrictions." *Id.*

The Court noted that it had previously upheld "generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself," such as requirements that candidates show some voter support to qualify for the ballot and rules preventing "party raiding" in which voters switch parties to manipulate primary results. *Id.* at n. 9. Further, it had upheld restrictions on candidate eligibility which served legitimate state goals unrelated to First Amendment values. *Id.,* citing *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (permissible to prevent incumbent Justice of the Peace from seeking election to state legislature where legislative term would begin before end of current judicial term).

■ Constitutional challenges to election laws cannot be resolved by any automatic test, but must instead be subjected to a rigorous analytical process as follows:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. at 1570.

■ The *Anderson* Court found that an early filing deadline may have a "substantial impact" falling disparately on "independent-minded voters," because it prevents independents from entering the political arena and prevents the creation of new political coalitions at any time after mid-March, while permitting the majority parties to adopt their nominees and develop their platforms for several more months. *Id.* at 790–91, 103 S.Ct. at 1570–71. The Court noted that it is especially difficult for a State to justify a restriction that affects "an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.* at 793, 103 S.Ct. at 1572. Citing *Clements,* the Court specified that its ballot access analysis focuses on "the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." *Id.* A burden that falls unequally on new or small political parties necessarily impinges associational choices protected by the First Amendment. *Id.*

The State of Ohio identified three interests furthered by the early filing deadline: voter education, equal treatment for partisan and independent candidates, and political stability. *Id.* at 796, 103 S.Ct. at 1573–74. The Court scrutinized each closely, and rejected each in turn. For example, while acknowledging that the State has a legitimate interest in fostering voter education, the Court nevertheless found that the combination of a literate electorate and instantaneous transmission of news and information makes it "unrealistic" to suggest that it would take the electorate seven months to become informed about a candidate. *Id.* at 797, 103 S.Ct. at 1574. Further, it was by no means clear to the Court that the interest in voter education was served by a deadline which could result in a nationwide candidate deciding not to campaign in Ohio at all. *Id.* at 798, 103 S.Ct. at 1574–75. "A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Id.*

The Supreme Court further developed the freedom of association analysis in *Eu v. San Francisco County Democratic Central Com-*

*mittee,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). Challenged there were restrictions on the right of political parties to make endorsements in primaries. In addition to burdening protected freedom of speech, these restrictions also infringed freedom of association. *Id.* at 224, 109 S.Ct. at 1020. "Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to 'identify the people who constitute the association,' and to select a 'standard bearer who best represents the party's ideologies and preferences.'" *Id.* (citations omitted). The Court found that depriving a political party of the power to endorse "suffocates this right." *Id.* The Court applied strict scrutiny "because the ban burdens appellees' rights to free speech and free association." *Id.* at 225, 109 S.Ct. at 1021.

Against this backdrop, *Legislature v. Eu* was decided. The California Supreme Court recognized that to determine the proper standard for resolving the petitioners' challenge, it was required to apply the balancing test of *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). 54 Cal.3d at 516–17, 286 Cal.Rptr. 283, 816 P.2d 1309. However, it distinguished *Eu v. San Francisco County Democratic Central Committee,* noting that strict scrutiny was applied there because of the serious impact on First Amendment freedoms of speech and association, opining that these interests were "not as directly impacted by Proposition 140," and concluding that *"Eu* is probably inapposite." *Id.* at 515, 286 Cal.Rptr. 283, 816 P.2d 1309. The court did not address, however, the impact of Proposition 140 on the freedom of association explained in *San Francisco County Democratic Committee.*

In *San Francisco County Democratic Committee,* the United States Supreme Court found that depriving a political party of the power to *endorse* the candidate of its choice "suffocates" the party's associational right to "select a 'standard bearer who best represents the party's ideologies and preferences.'" Depriving a political party and its members of the power to *elect* the candidate of their choice far more directly extinguishes

the associational right to select a standard bearer. Thus, the *Legislature v. Eu* court's reasoning in distinguishing *San Francisco County Democratic Committee* is unpersuasive.

The *Legislature v. Eu* court next cited *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), for the proposition that the Supreme Court gives "wide latitude to state election laws, even those that may restrict the electorate's choice of representatives." 54 Cal.3d at 516, 286 Cal.Rptr. 283, 816 P.2d 1309. *Rodriguez v. Popular Democratic Party* cannot, however, properly be characterized as an election case. At issue there was the procedure for appointing an interim replacement where a member of the Puerto Rico Legislature was unable to complete his or her term. Reaffirming its previous holdings that appointment, rather than election, was a constitutionally acceptable method of filling a vacated position on an interim basis, the Court discerned no constitutional defect in permitting the political party of the elected legislator to make the replacement appointment, nor in the political party selecting the replacement appointee by means of an internal election by its party members. The procedure did not restrict access to the electoral process because all voters had an equal opportunity to elect the candidate of their choice in the general elections. Here, in contrast, the challenged term limits restrict the choice of candidate in the general elections. Thus, *Rodriguez* is inapplicable.

The *Legislature v. Eu* court next analyzed Proposition 140 under the *Anderson v. Celebrezze* test. Considering the character and extent of the injury to protected rights, the court described each party's arguments. Without any explicit analysis of those arguments, the court concluded that "although Proposition 140 does affect the rights of voters and candidates to a degree, there are several mitigating aspects, including the voters' continued right to vote for any qualified candidates, as well as the candidates' ability to run for other public offices, their entitlement to a significant period of service in office before the term limitations apply, and the 'prospective' application of the limitation

1094

provision." 54 Cal.3d at 519, 286 Cal.Rptr. 283, 816 P.2d 1309. However, these factors do not mitigate the injury to the voters' and political parties' right to choose their own standard bearer.

The court noted that the case of *De Bottari v. Melendez,* 44 Cal.App.3d 910, 119 Cal.Rptr. 256 (1975), in which a California court struck down a local ordinance prohibiting recalled council members from running for city council within a year of the recall, did not involve term limits. 54 Cal.3d at 522, 286 Cal.Rptr. 283, 816 P.2d 1309. It therefore felt it unnecessary to consider, and did not overrule, the following reasoning of that court:

> It would be wholly inadequate to say that supporters of a recalled official could find another candidate to champion their point of view, for a candidate is more than his political platform. Temperament, native skill, and experience make some persons more effective in office than others, and more attractive to voters.... A law which bars established community figures from seeking municipal office significantly restricts the choice of voters. The impact of the law in question on the right to vote is therefore real and appreciable.

44 Cal.App.3d at 916–17, 119 Cal.Rptr. 256. This Court, however, finds the reasoning of *De Bottari* persuasive, and *Legislature v. Eu* less so for failure to consider directly the issue of whether candidates are truly fungible, as its analysis assumes. Thus, the *Eu* decision failed to express a sufficiently weighty evaluation of the injury component of the *Anderson* test.

The *Legislature v. Eu* court turned next to the state interests asserted in the statement of purpose enacted by the voters as Article IV § 1.5 of the California Constitution, set out in full above. The court found that the interests identified were both legitimate and compelling, citing *State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 223 S.E.2d 607 (1976), which upheld a state gubernatorial term limit provision. In *Maloney,* the West Virginia Supreme Court of Appeals held that "restriction upon the succession of incumbents serves a rational public policy" of avoiding "power of incumbent officeholders

to develop networks of patronage" and "an entrenched political machine which could effectively foreclose access to the political process" and is most likely to "sacrifice the well-being of ... minorities." *Id.* at 517–18. The *Legislature v. Eu* court rejected the argument that, due to the substantial concentration of power possessed by the chief executive, gubernatorial term limits serve a more significant interest than do legislative term limits. The court opined that "many, if not all, of the considerations mentioned in *Maloney* ... would apply with equal force to the legislative branch." 54 Cal.3d at 521, 286 Cal.Rptr. 283, 816 P.2d 1309. The *Legislature v. Eu* court concluded that "it would be anomalous to hold that a statewide initiative measure aimed at 'restor[ing] a free and democratic system of fair elections,' and 'encourag[ing]' qualified candidates to seek public office," is invalid as an unwarranted infringement of the rights to vote and to seek public office." 54 Cal.3d at 524–25, 286 Cal. Rptr. 283, 816 P.2d 1309.

■ However, as *Anderson* made clear, it is not only the asserted state interest but also the actual effect of the regulation which must be weighed against the rights infringed. Thus, in *Anderson,* the Court noted that "a State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." 460 U.S. at 798, 103 S.Ct. at 1575. Here, the state's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the choice of candidates available to them must similarly be viewed with at least some skepticism.

Further, this Court finds persuasive two distinctions between gubernatorial and legislative term limits mentioned but rejected in *Legislature v. Eu.* First, the greater concentration of power in the chief executive makes abuse of long term incumbency more likely and thus makes more compelling the state's interest in limiting the number of gubernatorial terms. Second, a statewide gubernatorial term limit is a restriction imposed by the represented group itself by its own choice, presumably because, in the judgment of the represented group, the term

limit serves an important interest. In contrast, a legislative term limit may be, and in the instant case is, imposed on certain districts against their own political will and judgment.

Finally, the *Legislature v. Eu* court considered the third component of the *Anderson* test, whether "less drastic" alternatives, such as limitations on consecutive terms and restrictions on campaign contributions to incumbents would be sufficient to promote and accomplish the asserted state interests. *Id.* at 522, 286 Cal.Rptr. 283, 816 P.2d 1309. It concluded that such measures "would have been inadequate to accomplish the declared purpose of Proposition 140 to eliminate the 'class of career politicians' that assertedly had been created by virtue of the 'unfair incumbent advantages.' " *Id.* at 523, 286 Cal. Rptr. 283, 816 P.2d 1309. The court noted that 92 percent of all incumbents were re-elected in the 1990 election, and concluded that incumbents "do indeed appear to enjoy considerable advantages over other candidates." *Id.* Therefore, the framers of Proposition 140 "reasonably could conclude that a lifetime ban was necessary to assure that a former office holder could not reinvoke at least some of the advantages of incumbency to gain reelection after leaving office for a term or more." *Id.*

Again, the court's discussion failed to supply the type of rigorous analysis called for by and demonstrated in *Anderson.* While the advantages of current incumbency may have been adequately identified, and even assuming that those advantages are "unfair," the court provided no explanation of how those advantages could continue to exist after an office holder leaves office for one or more terms, particularly the "unfair" advantages which must necessarily arise out of more than mere name recognition.

The court acknowledged that respondents had not "offered evidence to support all the various premises on which Proposition 140 is based," but held that a state need not empirically demonstrate "all of the various evils that its regulations seek to combat," for to impose such a requirement would necessitate that a state wait until its electoral process had suffered actual damage before taking regulatory action. *Id.* at 524, 286 Cal.Rptr. 283, 816 P.2d 1309, citing *Munro v. Socialist Workers Party,* 479 U.S. 189, 195–96, 107 S.Ct. 533, 537, 93 L.Ed.2d 499 (1986). However, the regulation at issue in *Munro* had only a "slight" effect on constitutional rights. *Id.* at 199, 107 S.Ct. at 539. Therefore, the least searching analysis allowed by *Anderson* applied there. It does not apply here, for the reasons stated above.

In applying the required standard on a motion to dismiss, the Court must consider whether Plaintiffs could prove any set of facts under their complaint which would entitle them to relief. The findings of the *Legislature v. Eu* court, made without benefit of fact-based proceedings in a trial court and without sufficient expression of the court's analysis to demonstrate compliance with the requirements of *Anderson,* do not conclusively establish that Plaintiffs will be unable to prove any such set of facts.

Further, in their complaint here, Plaintiffs claim that they and other voters who desire to vote for incumbents are being singled out for disparate treatment. Plaintiffs may be able to prove here that the challenged term limit has a disparate impact which falls on "an identifiable political group whose members share a particular viewpoint, associational preference, or economic status" or other protected group. *See Anderson,* 460 U.S. at 790, 103 S.Ct. at 1570. Defendants contend that they cannot do so, but it is not impossible as a matter of law. Defendants present no argument that Plaintiffs would be unable to show entitlement to relief if they establish this type of disparate impact on an identifiable political group.

■ The analysis of *Anderson v. Celebrezze* has been reaffirmed and clarified since *Legislature v. Eu* was decided. It is now clear that the rigorousness of the required inquiry into the propriety of a state election regulation depends on the extent to which the challenged regulation burdens First and Fourteenth Amendment rights. *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992). If the burden is "severe," the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* In contrast, if the law

imposes only "reasonable, nondiscriminatory restrictions," the state's important regulatory interests are generally sufficient to justify the regulations. *Id.*

In *Burdick v. Takushi,* the Court upheld a prohibition on write-in votes, holding that the impact on First Amendment freedoms was "slight" in light of the various mechanisms ensuring easy access to the ballot. There the plaintiff sought only to write in a fictional character as a protest vote. Here, in contrast, the term limit operates to exclude permanently a class of candidates, and to deprive the voter Plaintiffs of the opportunity to cast votes for the candidate of their choice who has a strong likelihood of prevailing. The voter Plaintiffs have adequately demonstrated that this restriction constitutes a severe infringement of their associational rights.

Thus, Plaintiffs have stated a claim on which relief could be granted for injury to their First Amendment rights. The Court does not find, at this stage of the proceedings, that the challenged term limits are constitutional as a matter of law. The motion to dismiss must accordingly be denied.

*Motion for Preliminary Injunction*

 "The function of a preliminary injunction is to maintain the *status quo ante litem* pending determination of the action on the merits." *Washington Capitols Basketball Club, Inc. v. Barry,* 419 F.2d 472, 476 (9th Cir.1969). The moving party is entitled to a preliminary injunction if it either establishes a combination of probable success on the merits and the possibility of irreparable harm, or demonstrates that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). The test is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Id.* at 1217 (quoting *San Diego Committee Against Reg-*

*istration and the Draft v. Governing Board of Grossmont Union High School Dist.,* 790 F.2d 1471, 1473 n. 3 (9th Cir.1986)).

 In the instant case, the likelihood of success on the merits of the constitutional challenge to the term limit provisions is difficult to evaluate. As noted above, the Court is unwilling to rely upon *Legislature v. Eu,* decided on a limited factual record, to find that the challenged term limits are constitutional as a matter of law. Nor is *United States Term Limits, Inc. v. Hill,* 316 Ark. 251, 872 S.W.2d 349 (1994), which followed *Legislature v. Eu* in upholding legislative term limits without substantial analysis, persuasive on this point. On the other hand, there is no authority finding any state term limits unconstitutional.

*U.S. Term Limits, Inc. v. Thornton,* ── U.S. ──, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) is largely inapposite, because it concerns only term limits imposed on members of the United States Congress which violate the Qualifications Clause of the United States Constitution.[2]

To resolve this case, the Court will be required to scrutinize closely the interests asserted by the state and the relationship of those interests to the term limits imposed. This will require a more developed record than that presently before the Court, which is largely silent on these points. To be sure, Plaintiff Bates declares that the Assembly has changed since 1990, being characterized now by an almost equal division between Republicans and Democrats. He declares that Assembly committees' members and chairs change frequently and that the most powerful committees now include the newest members of the Assembly. In addition, Plaintiff Bates declares that incumbency is no longer as great an advantage as it was in 1990 and that numerous incumbents are now defeated at the polls. This information is not sufficiently precise to allow for resolution of

---

**2.** The broad language utilized by the Court, that the Framers implemented as a "fundamental principle of our representative democracy" that "the people should choose whom they please to govern them," thus applies only to the federal government. It is applicable to the instant case only to the extent that the California voters'

stated purposes in enacting Proposition 140 to restore the system of representative government established by the "Founding Fathers" demonstrates an intent to tie the principles of the California Constitution directly to those of the United States Constitution.

the case on the merits, however, even on an interim basis.

Therefore, this Court cannot find that Plaintiffs have established probable success on the merits, but only that they have raised serious questions. Plaintiffs accordingly must establish that the balance of hardships tips sharply in their favor in order to prove their entitlement to preliminary injunctive relief.

This they have not done. Plaintiffs make out a showing that, to the extent the term limits are unconstitutional, their constitutional rights will be impinged prior to trial in this matter; they have thus shown the possibility of irreparable harm. However, Plaintiffs have not established that they are likely to prevail, and therefore have also failed to establish that they are likely to be irreparably injured.

In balancing hardships, the Court cannot ignore the consequences to the state of thrusting into the election a candidate whose qualification to serve may ultimately prove invalid. Nor can the Court ignore the likelihood that granting the injunction in favor of Plaintiff Bates would cause other incumbents who would otherwise be barred by the term limit to file their own actions seeking similar relief. The chaos and voter disappointment which could result from an improvidently granted order weighs against granting a preliminary injunction on less than a showing that Plaintiffs are likely to prevail.

The Court must also take into account the fact that Plaintiffs have created the situation which they argue necessitates preliminary injunctive relief by their own delay in bringing this action. Plaintiff Bates, for example, has known since November 6, 1990 that, absent another constitutional amendment or judicial action invalidating Proposition 140, he would be "termed out" at the end of his current term. Plaintiff Bates further knew that he would face the November, 1995 deadline for filing his declaration of intention to be a candidate in the 1996 election. Yet Plaintiffs waited until July 20, 1995 to file this action.

The Court accordingly finds that Plaintiffs have failed to meet their burden of establishing that the balance of hardships tips strongly in their favor, and therefore have failed to demonstrate their entitlement to preliminary injunctive relief.

*Application for Certification and Stay*

 Defendants and Intervenors request that this Court certify for immediate appeal the portion of this order denying their motions to dismiss, and stay proceedings in this Court pending resolution of that appeal. The Court has the discretion to do so under 28 U.S.C. § 1292(b) only if the Court is not only "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion," but also of the opinion that "an immediate appeal from the order may materially advance the ultimate termination of the litigation."

This Court is of the opinion that the portion of this Court's order finding that Plaintiffs have stated a claim involves a controlling question of law as to which there is substantial ground for difference of opinion. However, this Court is not of the opinion that an immediate appeal would materially advance the ultimate termination of the litigation. Rather, this Court is of the opinion that this case warrants and requires development of as full an evidentiary record as possible. The Court of Appeals will then be able to give the ultimate judgment of this Court a full review.

Defendants and Intervenors argue that immediate appellate review would serve the public's interest in electoral stability, in that "so long as this case remains pending, no one will know which incumbents are eligible to run for ... state office." This may have been true had this Court granted Plaintiffs' motion for preliminary injunction, and this was an important reason for denying that motion. However, in light of the denial of that motion, there is no impediment to the State of California enforcing Proposition 140 in conducting the 1996 elections, and no cause for confusion. Therefore, this application is denied.

*CONCLUSION AND ORDER*

For the reasons stated above, the Court rules on the matters before it as follows:

1098

1. The motion to intervene of applicants Peter Schabarum and Lewis K. Uhler is GRANTED. The motion to intervene of applicants National Tax Limitation Committee, Lee A. Phelps and the Alliance of California Taxpayers and Involved Voters is DENIED.

2. The motion for abstention of Intervenors is DENIED.

3. The motions to dismiss of Defendant Bill Jones and of Intervenors are DENIED.

4. The motion for preliminary injunction of Plaintiffs is DENIED.

5. The application of Defendants and Intervenors for certification of the order denying their motions to dismiss and for stay of these proceedings is DENIED.

IT IS SO ORDERED.